# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Lucas Shirley II | ) | 3:23-mj- 1042- LLL |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 24, 2023_____ in the county of _____Duval_____ in the _____Middle_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 5861(d)-(e) | Possession and transfer of unregistered short-barreled rifles |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

David Simmons, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/1/23

_____
*Judge's signature*

City and state: _____Jacksonville, Florida_____

Laura Lothman Lambert, U.S. Magistrate Judge
*Printed name and title*

<u>**Affidavit in Support of an Application for a**</u>
<u>**Search Warrant and a Criminal Complaint**</u>

I, David Simmons, being duly sworn, depose and state:

## I.     INTRODUCTION

### Identity of Affiant

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms

and Explosives (hereinafter "ATF"), and have been since 2015.  I am an

investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7).

As such, I am empowered by law to conduct investigations of, and to make arrests

for, offenses enumerated in 18 U.S.C. § 2516.  I have successfully completed the

Criminal Investigators Training Program Academy and the ATF Special Agent Basic

Training Program at the Federal Law Enforcement Training Center located in

Glynco, Georgia.  I am currently assigned to the ATF Tampa Field Division,

Jacksonville Field Office.  I have successfully completed investigative training

courses in the field of narcotics investigations/operations and firearms investigations,

in addition to conducting both state and federal felony level criminal investigations.

I have participated in many investigations involving the unlawful possession and

distribution of firearms.

2.     I am familiar with, and have participated in, many methods of

investigation, including, but not limited to, electronic surveillance, visual

surveillance, general questioning of witnesses, use of search warrants, use of

confidential informants and use of undercover agents.  Based on my knowledge,

training, and experience, and my participation in this investigation and other investigations involving the illegal possession, use, sale, and transfer of firearms, as well as drug trafficking, I know that:

a. Persons engaged in firearms offenses, such as, firearms possession by prohibited persons, illegal firearms trafficking, and firearm possession in furtherance of drug trafficking, commonly maintain addresses or phone numbers and books or ledgers that reflect names, addresses, social-media contacts, and/or phone numbers of their associates, suppliers, and clients in their residence, on their cellular and tablet devices, or on their persons, where they are concealed from law enforcement authorities and third parties;

b. Persons involved in firearms offenses frequently take or cause to be taken photographs or videos of themselves, their associates, and their firearms, and that these persons maintain these photographs or videos at their residence, and on their computers, tablet devices, portable digital media, and cellular devices;

c. Electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the internet-capable device. This information can sometimes be recovered with forensics tools.

d. Many people who own, possess, acquire, or maintain firearms, whether prohibited or not, keep and store, at their residences, firearms,

2

ammunition, gun parts, gun-cleaning kits, holsters, ammunition belts, original box-packaging, targets, expended pieces of lead, evidence of the purchase of the firearm, and bullet-loading equipment either in their residence, storage building, or storage shed.

e. Illegal firearm and drug traffickers often place assets, including accounts at financial institutions, in names other than their own to avoid the detection of these assets by government or other law enforcement agencies. Even though these assets are in other persons' names, the illegal firearm and drug traffickers continue to use these assets and exercise dominion and control over them;

f. Illegal firearms and drug traffickers often must maintain large amounts of United States currency on hand in order to maintain and finance their on-going business;

g. Illegal firearms and drug traffickers often maintain books, records, receipts, notes, ledgers, computers and computer disks, airline tickets, money orders, cashier check receipts, photographs, bank records, credit card records, automobile rental records, vehicle registrations, real estate records, mail and contract mail carrier records, records of shipping packages, keys to safe deposit boxes, and other papers relating to the manufacture, transportation, ordering, sale, of firearms and controlled substances;

h. Illegal firearms and drug traffickers often use cell phones, smart phones, and other electronic devices to facilitate their illicit transactions and to move and transfer any illicit proceeds. Illegal firearms and drug traffickers, using cell phones and other electronic devices with internet access, use the internet and various social-media applications to advertise illegal sales, to facilitate illicit transactions with their customers and sources of supply, and to brag about their trafficking activities. Illegal firearms and drug traffickers use cell phones and other electronic devices to keep electronic record of customers, associates, carriers, co-conspirators, and suppliers, and to keep electronic record of trafficking activity. Illegal firearms and drug traffickers use cell phones and other electronic devices to conduct financial transactions with and launder their illicit proceeds using various applications for internet banking and internet financial services. Illegal firearms and drug traffickers often carry, possess, and secrete, on their person, in their residences, in their businesses, and in stash or trap houses (residences used to store and distribute illegal drugs and firearms) multiple cell phones and electronic devices. Illegal firearms and drug traffickers have been known to use multiple "burner" cell phones and have been known to periodically stop using one cell phone and switch to another cell phone once a co-conspirator, customer, associate, or supplier has contact with law enforcement. From my training and experience, I know cell phones,

4

particularly smart cell phones, and other electronic devices (such as tablets), possess a large capability to store vast amounts of electronic data, including photos, text messages, videos, notes, and other electronically stored data, for extensive periods of time;

i. When illegal firearms and drug traffickers collect proceeds from illicit sales, they often attempt to legitimize these profits. To accomplish this goal, firearms and drug traffickers use, including but not limited to, foreign and domestic banks; internet banks and internet banking and financial services, e.g., Coinbase, Cashapp, and Venmo, and their attendant services; securities; cashier's checks; money orders; bank drafts; letters of credit; debit or credit cards; brokerage houses; trusts; partnerships; shell corporations; and business fronts;

j. Illegal firearms and drug traffickers and persons engaged in firearms offenses commonly maintain addresses and/or telephone numbers, pager records, telephone toll records, cell phone records and other records of phone calls, both in writing and electronically, in books or papers, which reflect the names, addresses and phone numbers for their associates and clients, in their residences or on their persons;

k. Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal firearm and drug trafficking;

1. Whether or not the firearm(s) sought are recovered through this search warrant, the above items tend to show that a firearm(s) existed and may have been located in a place to which the suspect had access, and these items would tend to connect the suspect with the firearm(s) sought. In my experience, a person does not normally dispose of firearms after the commission of a crime or after illegal possession of firearms and they are, therefore, likely to be found in any location or vehicle to be searched or on the person of any suspect to be searched pursuant to this warrant.

3. Because the target in this investigation is using electronic devices (including cellular telephones and 3-d printers) to manufacture, possess, advertise, and distribute firearms, short-barreled rifles, silencers and conversion devices that turn various firearms into machineguns, and these conversion devices themselves are defined as machineguns under 26 U.S.C. § 5845(b), the search warrant I am applying for also seeks permission to seize and further search certain electronic devices and electronic media found at the location to be searched at the time the search warrant is executed. Accordingly, this warrant would also permit law enforcement to obtain from the target of the investigation the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers,

that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records

7

data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those

published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises.

4. The information contained in this affidavit is based on my personal knowledge derived from my participation in this investigation, as well as the information, observations, and investigations of other federal, state, and local law enforcement officers, and my review of records and other documents. This affidavit also contains information that was provided by an ATF confidential informant, hereinafter referred to as a CI. The CI, irrespective of the sex, is referred to in the masculine gender. Because this affidavit is being submitted for the limited purpose of

establishing probable cause to secure a search warrant for the residence identified in this affidavit, I have not included every fact known about this investigation.

5.     In the course of my duties as a special agent of the ATF, I have been investigating violations of 18 U.S.C. § 922(o) (possession of machineguns); 26 U.S.C. § 5861(a) (failure to register as a firearms dealer, manufacturer, or importer, or to pay required tax); 26 U.S.C. § 5861(j) (transport, delivery, or receipt of unregistered firearm); and 26 U.S.C. § 5861(f) (making of firearm in violation of federal law) (hereinafter, the "Specified Federal Offenses") committed by LUCAS SHIRLEY II. This affidavit relates to that investigation.

## Requested Warrant

6.     Based on the information in this affidavit, I request that a search warrant be issued for the residence located at 2085 Second Street, Jacksonville, Florida 32218 (**Target Location**) because there is probable cause to believe that evidence of violations of the Specified Federal Offenses by SHIRLEY is present at the **Target Location**.

## Criminal Complaint

7.     This affidavit is also submitted in support of a criminal complaint charging SHIRLEY with possession and transfer of unregistered short-barreled rifles in violation of 26 U.S.C. § 5861(d)-(e).

## II.   PROBABLE CAUSE

8.     On or about the week of January 1, 2023, I met with the CI.  The CI had been in contact with SHIRLEY, utilizing cellular telephone number 912-328-8362 ("SHIRLEY Cell Phone 1").  SHIRLEY had agreed to manufacture and sell firearms to the CI.  The CI had requested from SHIRLEY firearms that were easily concealable (short-barreled) and that were fully-automatic (machine guns).

9.     On January 4, 2023, the CI and I (while working in an undercover capacity) conducted a controlled purchase of firearms from SHIRLEY at the **Target Location**.  The CI and I travelled to the **Target Location** in a CI vehicle.  Once at the **Target Location**, the CI and I exited the CI vehicle, proceeded to the door of the **Target Location** and the CI knocked.  After a short period of time, the CI called SHIRLEY's cellular telephone number.  While the CI was calling SHIRLEY, SHIRLEY opened the door to the **Target Location** and invited the CI and me inside.

10.    As the CI and I entered the **Target Location**, both the CI and I were standing in the living room area.  SHIRLEY walked towards the rear of the **Target Location** to retrieve the firearms.  I observed a smelting pot covered with a silver metallic substance on the kitchen floor and a 3D printer on the living room floor.

11.    After a short period of time, SHIRLEY returned from the rear of the **Target Location** with three privately made rifles and one silencer.  A privately made firearm is defined as a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a

serial number placed by a licensed manufacturer at the time the firearm was produced. The term does not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date). SHIRLEY provided the privately made rifles and the silencer to the CI and me.

12.    The CI, SHIRLEY, and I then engaged in conversation. The CI asked SHIRLEY about the privately made pistol, a picture of which he (SHIRLEY) had sent to the CI via a text message from SHIRLEY Cell Phone 1. SHIRLEY stated that he was still putting a pistol together and that he had sold the other one. SHIRLEY stated that he was working on a lathe to drill out the barrels and produce rifling for better accuracy when firing. SHIRLEY then removed a sheet from the 3D printer that I had observed and showed it to me. SHIRLEY explained the parts on the sheet and the time it takes to make the parts. When asked about firearm parts, SHIRLEY stated that he was using a new source and could get parts shipped out the next business day.

13.    I asked SHIRLEY about one of the privately made rifles, which due to my training and experience, I recognized as a short-barreled rifle, with a silencer and a brass catcher attachment. SHIRLEY stated that once the parts came in, he could have a firearm ready the same day and that it would cost $1,200 for each set-up (short-barreled machine gun, silencer and brass catcher). I told SHIRLEY that I wanted the rifles short, fully-automatic, and equipped with silencers to keep them

quiet. SHIRLEY indicated that these rifles were chambered in 5.56mm but he could do .300 Blackout or .22 caliber to make them even quieter. (As background information, firearms expel projectiles in the caliber they are chambered in. A firearm chambered in 5.56mm will fire 5.56mm ammunition whereas firearms chambered in .22 caliber will fire .22 caliber ammunition. Chambering a firearm in specific calibers will have a direct correlation as to the report of the firearm, that is, how loud it will be when fired. A firearm chambered in .300 Blackout is commonly used in subsonic loading, reducing the sound signature of the firearm. A firearm chambered in .22 caliber utilizes a smaller diameter projectile and lower muzzle velocity, which in turn also reduces the sound signature of the firearm.) During this conversation with SHIRLEY, I advised SHIRLEY that I wanted a "few" rifles as specified above. SHIRLEY responded that he hoped I wanted more than a few to which I replied that I did.

14.    SHIRLEY told the CI that he wanted $3,800 for the three privately made rifles and the silencer. SHIRLEY stated that these firearms would not have any names on them indicating that they don't have serial numbers and that there is no registered transaction with a recorded buyer. SHIRLEY further stated that he was a firm believer that ATF does not have any business knowing what someone has in their house. SHIRLEY stated that once he had some money, he was going to buy more parts and continue building firearms. SHIRLEY pointed out a drill press on his living room floor that was to be used to assemble the firearms.

15.    The CI then gave SHIRLEY $3,800 in ATF Agent Cashier Funds for three privately made rifles and the silencer. I told SHIRLEY that I would get SHIRLEY'S cellular telephone number from the CI and be in touch regarding future purchases of firearms. SHIRLEY then directed the CI and me to the kitchen where he had molds in which he was attempting to make aluminum Glock switches. (I know from my training and experience that a Glock switch is a machinegun conversion device that when properly installed on a semi-automatic Glock pistol, converts it into a fully-automatic machinegun.) SHIRLEY indicated that he wanted to make a more durable product that wouldn't break.

16.    The CI and I exited the **Target Location** with the privately made firearms and silencer and placed the items in the rear of the CI vehicle. The CI and I then departed the area and proceeded to a predetermined meeting location.

17.    On January 6, 2023, I made a recorded call to SHIRLEY who was using SHIRLEY Cell Phone 1. SHIRLEY stated that he had placed an order for parts on that day and that he was awaiting delivery.

18.    On January 11, 2023, ATF Industry Operations Investigator (IOI) Supervisor Carolyn King queried databases to determine if SHIRLEY was a licensed dealer of firearms. IOI Supervisor King was unable to locate any records indicating that SHIRLEY was a licensed FFL (federally firearms licensee).

19.    On January 11, 2023, I spoke with SHIRLEY on a recorded line. SHIRLEY, who was using SHIRLEY Cell Phone 1, stated that he registered as a vendor with his parts company and that he also invested in new equipment to

14

manufacture firearms. SHIRLEY stated that he was making privately made rifles, as well as, privately made pistols. SHIRLEY further stated that it was almost like he was an FFL without the paperwork. SHIRLEY stated that he would be ready around January 15 or 16, and that the cost would be $10,000 to $10,750.

20. On January 18, 2023, I spoke with SHIRLEY on a recorded line. Using SHIRLEY Cell Phone 1, SHIRLEY stated that he was finishing assembling the firearms and wanted to conduct a transaction. I advised SHIRLEY that I was out of town and would be back in a few days. SHIRLEY advised me that a rental company had taken his vehicle back and that he had to contact his probation officer and let them know he wouldn't be making it in for a visit. Based on my review of SHIRLEY's criminal history, I understand that he is serving a 10-year term of probation in connection with a case in which the court withheld adjudication of guilt for charges of possession of methamphetamine with intent to sell, and sale, deliver, possess, or purchase a controlled substance.

21. I continued contact with SHIRLEY on January 18 and 19, 2023, on a recorded line. SHIRLEY was using SHIRLEY Cell Phone 1. I advised SHIRLEY that I was still out of town, but would return in a couple of days. In one text, SHIRLEY responded "Damn. 10-4. I'm dead in the water until I see you is why. No way to probation, both of my printers are down needing parts, when it rains it pours huh, lol. But I appreciate that bro. No spoilers, but I've got you hooked up with the shit the seals run, in your preferred length with all steel hand crafted, full welded hush cans with all of the property geometry and expansion chambers, several

15

burners, with all hand turned custom barrels, a G17 with upgraded internals, and a 22lr AR platform, with a black dog 25rnd mag. And the high end tuning and top tier features you'll just have to see lol." Based on my training and experience, I understood that SHIRLEY was stating that he was manufacturing and modifying firearms for the buyer. I further understood that the term "hush can" was being used to describe a firearm silencer.

22. On January 22, 2023, SHIRLEY contacted me from telephone number 904-445-6739 ("SHIRLEY Cell Phone 2"). SHIRLEY advised me that his original cellular telephone had been shut off and inquired when I would be back. I advised SHIRLEY that I intended to be back in the following days.

23. On January 24, 2023, in an undercover capacity, I conducted a controlled purchase of firearms from SHIRLEY at the **Target Location**. I travelled to the **Target Location** in a UC vehicle. Once at the **Target Location**, I exited the UC vehicle, proceeded to the door of the **Target Location** and knocked. After a short period of time, SHIRLEY opened the door to the **Target Location** and invited me inside.

24. As I entered the **Target Location**, SHIRLEY began showing me two 3D printers in his living room and explained how they had been working. SHIRLEY then told me that he wanted to show me what he had been working on and motioned for me to follow him down the hallway of the **Target Location**.

25.     SHIRLEY directed me into one of the rooms off the hallway and showed me his welding area. SHIRLEY had a welding bench and ventilation set-up in the room. SHIRLEY stated that everything was made by his hands. SHIRLEY then directed me into another room off the hallway and showed me his painting area. SHIRLEY currently had four silencers hanging and one lower receiver. A lower receiver contains the trigger and firing components. SHIRLEY removed the lower receiver and showed it to me. SHIRLEY then removed the four silencers and explained how he had made them. SHIRLEY and I then carried the silencers back to the living room area.

26.     SHIRLEY began handing me four privately made rifles. SHIRLEY explained the accessories/hardware on the rifles and further explained that the rifles with Eotech brand sighting systems were semi-automatic. SHIRLEY continued and explained that the rifles with the red dot sighting systems (a firearm sighting system that superimposes a red dot on the intended target) were fully-automatic. SHIRLEY then handed me a privately made derringer-style pistol. A derringer is a small, easily concealable, pistol-style firearm. SHIRLEY explained how he made them, how they functioned and that he chambered them in .22 caliber. SHIRLEY then retrieved a privately made semi-automatic pistol. SHIRLEY explained how he made the pistol and that it was chambered in 9mm.

27.     SHIRLEY showed me a ledger, which was on a pad of paper by the couch in the living room. The ledger had a pricing breakdown for the firearms. SHIRLEY stated that he wanted $10,900 for the four privately made rifles and four

17

silencers, $300 for each privately made derringer-style pistol, and $650 for the privately made semi-automatic pistol. SHIRLEY agreed to exchange the four privately made rifles and silencers for $11,000 and for me to take the three privately made derringer style pistols with payment to occur at a later date. SHIRLEY agreed to hold the privately made semi-automatic pistol for me.

28. I handed SHIRLEY $11,000 in ATF funds and loaded the privately made firearms and silencers into a duffle bag. SHIRLEY stated that he was going to order more parts and make additional firearms for me. SHIRLEY further advised me that he was looking for a place to test some of his projects, to include Glock switches and 3D printed upper receivers, in an effort to reduce any paper trails. SHIRLEY stated that he's been keeping up with the Second Amendment issues in the news and pointed to several AR-style pistol braces on the floor in the living room. (Approximately one week prior, on January 13, 2023, the Department of Justice publicly announced a final regulation, which makes clear that when manufacturers, dealers, and individuals use a stabilizing brace to convert a pistol into a rifle with a barrel of less than 16 inches (i.e., a short-barreled rifle), they must comply with the laws that regulate those rifles, including the National Firearms Act.)

29. I exited the **Target Location** with the privately made firearms and silencers and placed the items in the UC vehicle. I then departed the area and proceeded to a predetermined meeting location.

30. On January 25 through January 28, 2023, I texted and made recorded phone calls with SHIRLEY via SHIRLEY Cell Phone 1. I advised SHIRLEY via

text message, "When i see you again imma need to talk about a special request. Small thing like i left behind but with a hush puppy on jt for an errand i gotta run." SHIRLEY responded, "That's easy. Done a few before. Come on by and we'll go over it all" and "That's actually what I started with way back when." SHIRLEY also stated, "Also, the latest build I finished today, is pretty fucking sweet. I call it 'careless whispers' . 22lr, with the best can I've ever built, buffer less recoil system, gasless cycling and can still run 5.56 by just swapping out the bcg. I'm testing it tonight with the quiet subsonic rounds I bought, and I expect great things." Based on my training and experience, I understood that SHIRLEY was stating that he previously manufactured a .22 caliber rifle with a silencer.

31.     On January 29, 2023, I requested a National Firearms Act (NFA) check of SHIRLEY to determine if he (SHIRLEY) had any NFA items registered with ATF. On January 30, 2023, I received a response indicating that ATF has no record of NFA firearms registered by SHIRLEY.

32.     On January 29, 2023, I queried the Jacksonville Electric Authority (JEA) database for the account information associated with the **Target Location**. According to JEA, the customer's name is listed as "Shirley, Lucas Joel" and shows a service start date of September 1, 2022. The account status shows that the account is currently active.

33.     On January 30, 2023, I measured the four privately made rifles purchased from SHIRLEY on January 24, 2023. The overall length of each of the

four rifles was approximately 23 1/4 inches. The length of each of the barrels was approximately 7 1/2 inches.

34. Based on a ruling derived from the National Firearms Act of 1934 and further defined in 18 U.S.C. § 921(a)(3), (7), and (8), the term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

35. Because the barrel length of all four privately made rifles were less than sixteen inches and the overall lengths were less than twenty-six inches, I determined that these firearms meet the legal definition of a short-barreled rifles. The measurements were taken per the prescribed training methods of ATF.

**CONCLUSION**

36. Based on the foregoing, there is probable cause to believe that on January 24, 2023, SHIRLEY possessed and transferred unregistered short-barreled rifles in violation of 26 U.S.C. § 5861(d)-(e). There is also probable cause to believe that SHIRLEY has committed violations of 18 U.S.C. § 922(o) (possession of machineguns); 26 U.S.C. § 5861(a) (failure to register as firearms dealer, manufacturer, or importer, or to pay required tax); 26 U.S.C. § 5861(j) (transport, delivery, or receipt of unregistered firearm); and 26 U.S.C. § 5861(f) (making of firearm in violation of federal law). Furthermore, there is probable cause to believed that the **Target Location**, more particularly described in Attachment A, contains items

which are evidence of a crime, the fruits and instrumentalities of a crime, and

property used in committing a crime, as further described in Attachment B.

Respectfully submitted,

David Simmons, Special Agent
BUREAU OF ALCOHOL,
TOBACCO, FIREARMS &
EXPLOSIVES (ATF)

Subscribed and sworn to before me this _____ day of February 2023.

LAURA L. LAMBERT
United States Magistrate Judge
Middle District of Florida

**ATTACHMENT A**
Location to be Searched

The **Target Location** is the premises located at 2085 Second Street, Jacksonville, Florida 32218, within the Middle District of Florida.

The **Target Location** contains a single-family residence located on the north side of Second Street, east of Cedar Street and west of Holly Street. The residence at the **Target Location** is white in color with a wooden deck on the west side of the residence. The **Target Location** is bordered by a chain link fence and has a group of mailboxes at the fence line next to the driveway. A photograph of the residence can be seen below:



The residence at the **Target Location** has black numbers "2085" affixed to the southwest corner.



## ATTACHMENT B
### Items to be Seized

1.      Ammunition, firearms accessories, and firearms (including silencers, short-barreled rifles, machineguns, and any part designed or intended, or combination of parts designed or intended, for use in converting a weapon into a machinegun);

2.      Kits, devices, packaging, tools, and other items related to the possession, manufacture, or transfer of ammunition, firearms accessories, or firearms, including raw materials, firearms parts, welding equipment, painting equipment, lathes, drill presses, molds, and grinders;

3.      Records and information concerning the possession, transfer, purchase, or sale of ammunition, firearms accessories, or firearms;

4.      Photographs or videos of ammunition, firearms accessories, or firearms;

5.      Currency, financial instruments, precious metals, jewelry, and other items of value, which may be the proceeds, or traceable to the proceeds of the illegal sale of ammunition, firearms, or firearms accessories;

6.      Records and information concerning the identity of any person with dominion or control over the location being searched, such as documents and papers bearing names and the address, registration or insurance documents, rental receipts, lease agreements, mortgage records, utility bills, canceled mail, paycheck stubs, or other employment records;

7.     Records and information concerning the identity of Lucas SHIRLEY II, such as personal identification documents;

8.     Cellular telephones (but not any cellular telephone on the person of any individual other than SHIRLEY);

9.     3D printers, 3D printer supplies, and packaging for such items;

10.    Computers, computer equipment, hard drives, and other electronic storage medium connected to any 3D printer; and

11.    For any cellular telephone, computer, or storage medium whose seizure is otherwise authorized by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, social media information or records, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

d. evidence of the times the COMPUTER was used;

e. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; and

f. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER.

Without applying for another search warrant, this warrant authorizes the search of any COMPUTER for the items, records, and information authorized to be seized, as described above. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical,

electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes the seizure of digital records and information described above only to the extent that they were created, saved, or edited during time period from August 1, 2022, through the date of execution of the warrant, except that evidence of who used, owned, or controlled a COMPUTER may be from any period of time through the date of the execution of the warrant.

During the execution of the search, law enforcement personnel are specifically authorized to obtain from SHIRLEY (but not any other individuals) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any cellular telephone(s) that are subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that SHIRLEY's physical biometric characteristics will unlock the cellular telephone(s). In this regard, law enforcement is authorized to press fingers or thumbs against, and/or put a face before, a sensor or any other security feature requiring biometric recognition of such cellular telephone(s) for the purpose of attempting to unlock the cellular telephone(s)'s security features in order to search the contents as authorized by this warrant.

4

While attempting to unlock the cellular telephone by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that Shirley state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the cellular telephone(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel Shirley to state or otherwise provide that information. However, the voluntary disclosure of such information by SHIRLEY or others is permitted.

If SHIRLEY refuses to allow law-enforcement agents to apply his biometric characteristics to any cellular telephone seized pursuant to this warrant in a manner consistent with this warrant, he will be ordered to appear before United States Magistrate Judge Laura Lothman Lambert in Jacksonville, Florida, to show cause why he should not be held in contempt for failing to comply with a valid court order.