**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA**

v.                                                    Case No. 3:23-cr-14-TJC-LLL

**LUCAS SHIRLEY, II**
_____

**DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM**
**AND REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant, Lucas Joel Shirley, II, by and through undersigned counsel, submits this Supplemental Sentencing Memorandum in anticipation of the Sentencing Hearing scheduled for Wednesday, January 10, 2024, at 10:00 AM.

## BACKGROUND

After Mr. Shirley made the decision to enter a plea of guilty, the parties began discussing the terms of a potential plea agreement. The government proposed an agreement with a plea to Count IV and Mr. Shirley's admission to the relevant conduct, including the manufacture, possession, and distribution of "eight or more" firearms, including firearms falling under the National Firearms Act, such as short-barreled rifles, machineguns, and silencers, and the possession and use of illegal drugs. The government expected that Mr. Shirley would score a Base Offense Level of 20 because the offense involved a firearm described in 26 U.S.C. § 5845(a) and he was a prohibited person at the

time of the offense due to being unlawful user of controlled substances, pursuant to USSG § 2K2.1(a)(4)(B)(i)(II) and (ii)(I). The government also anticipated Mr. Shirley receiving a four-level upward adjustment under § 2K2.1(b)(6)(B) because he used or possessed the firearms in connection with another felony offense, specifically possession of methamphetamine, a felony in the State of Florida.

The government expressed that if this were the case, it would lead to a six-level swing in the guidelines (in contrast with a lower Base Offense Level of 18 under § 2K2.1(a)(5) and no four-level adjustment under § 2K2.1(b)(6)(B)). In recognition of the significance of a six-level adjustment, the government included language in the Plea Agreement expressing its intent to recommend "a sentence at the low end of the applicable guideline range, as calculated by the Court." (Doc. 34 ¶ 7). However, the guidelines range as calculated in the Initial PSR, and now advocated for by the government, ended up being higher than either party anticipated.

Regardless, there was no agreement between the parties that the guidelines would be calculated in a certain way. Even if there were such an agreement, it would not control the guidelines calculation proposed by Probation in the PSR, nor would it bind this Court at sentencing. As the government aptly states in its Sentencing Memorandum, this Court and the parties share an "obligation to ensure that the Guidelines range is properly

determined." (Doc. 47 at 2). Mr. Shirley concurs with this sentiment, especially since the government requires defendants in plea agreements to waive their right to appeal a miscalculation of the guidelines.

Mr. Shirley first made his objections to the Initial PSR in the defense's letter dated November 5, 2023. (*See* Doc. 39 at 24-26). Upon further review of the language in the United States Sentencing Guidelines and relevant case law, Mr. Shirley withdraws his objection to the Base Offense Level. The Initial PSR and Final PSR indicate that Mr. Shirley is at Level 22 because he committed the "instant offense after sustaining one felony conviction of either a crime of violence or a controlled substance offense," under USSG § 2K2.1(a)(3). Unfortunately, the USSG sometimes includes in the definition of a person who sustained a "felony conviction" a person who is not actually a convicted felon. *See United States v. Fernandez*, 234 F.3d 1345 (11th Cir. 2000). Because this was Mr. Shirley's only unresolved objection to the Final PSR, he no longer objects to this Court adopting the Final PSR's guideline calculations.

As outlined in its Sentencing Memo, the government objects to the Final PSR insofar as it sustained Mr. Shirley's objections to the Initial PSR. (Doc. 47). The government offers arguments in support of the Specific Offense Characteristics contained in the Initial PSR, including a higher calculation of the number of firearms, an upward adjustment for trafficking of firearms, and

an upward adjustment for use of a firearm in connection with a felony offense. Mr. Shirley offers the following arguments against this Court adopting the government's view of the guidelines.

## I. Machinegun Conversion Devices Do Not Count as "Firearms" under USSG § 2K2.1(b)(1).

"Firearm" is clearly a word that needs to be defined in criminal prosecutions where criminal responsibility and appropriate punishment are decided based on the meaning of words. The government's own argument, which advocates for conversion devices to be considered as "firearms" in the same respect as pistols, rifles, and shotguns shows that the word has some ambiguous qualities, to say the least. Presumably, that is why the Sentencing Commission decided to define the word firearm in, of all places, the firearms guidelines.

The word is defined in Application Note 1, labeled "Definitions." USSG § 2K2.1 cmt. 1. This is the same note that defines other terms of consequence to the calculation of guidelines, like "controlled substance offense" and "felony conviction." *Id*. The note indicates that "'Firearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)." *Id*. Section 921 in turn states the following:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm

4

> silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).  Machinegun conversions devices are not weapons that are able to expel projectiles through an explosion; they are tiny metal objects with no utility unless attached to such a weapon.  Neither are they frames, receivers, mufflers, silencers, or bombs.  Therefore, they do not generally count as "firearms" under the guidelines.

The government argues that this Court should ignore the definition of firearm provided in the Definitions section, and instead infer its meaning through the context in which the word is used in other parts of section 2K2.1. The government insists that the inclusion of the phrase "firearm that is described in 26 U.S.C. § 5845(a)" appearing as an element in some of the Base Offense Levels means that the word "firearm" appearing in other parts of section 2K2.1 should be defined as it is in section 5845.  That definition is:

> The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device.

5

26 U.S.C. § 5845(a). *See also* § 5845(b) (defining conversion devices as machineguns). The government alternatively argues that there is a conflict between these two definitions that must be resolved with the definition in section 5845 prevailing.

However, the government and the judicial decisions it cites miss some key aspects about the text of USSG § 2K2.1, 18 U.S.C. § 921(a)(3), and 26 U.S.C. § 5845(a). Section 5845 is designed to address items that are generally considered to be more dangerous and unique than the average/basic firearm. That is why section 2K2.1 provides for higher base offense levels when an item meets section 5845's definition of "firearm." This is not to say that everything listed in section 5845(a) is guaranteed to be more dangerous than things listed in section 921(a)(3). But section 921 provides a more traditional definition of firearm.

While both list silencers and destructive devices, section 921 includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to *expel a projectile by the action of an explosive*." 18 U.S.C. § 921(a)(3)(A) (emphasis added). This is essentially the dictionary definition of a firearm, and every pistol, rifle, and shotgun falls within this definition. It therefore makes perfect sense that the Sentencing Commission chose to use the definition in section 921 to define "firearm" in 2K2.1. Nearly all of the items listed in section 5845 are "firearms" under section 921, albeit

with certain unique characteristics, such as shorter barrels or automatic firing capabilities.

The one exception is the inclusion of "machinegun" and its definition in 26 U.S.C. § 5845(a)-(b).  More accurately stated, part of the definition of a machinegun in 5845 definitely fits within the definition of a firearm in 921.  It is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The problem lies in Congress's decision to add into the definition: "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

However, this is not grounds to conclude that this part of subsection 5845(b)'s definition of machinegun should be used to override the entirety of the guidelines' definition of a "firearm."  If anything, the conclusion should be that conversion devices are only considered firearms in limited the context of applying the Base Offense Levels that refer to firearms "described in 26 U.S.C. § 5845(a)."  Under this approach, a conversion device could be used to enhance the Base Offense Level but would not be considered a firearm otherwise.  This is not an absurd result, considering how machinegun conversion devices are not firearms in any practical sense.

## II. The Special Offense Characteristic for "trafficking of firearms" under USSG § 2K2.1(b)(5) does not apply in this case.

"Trafficking of firearms" is a phrase that the Sentencing Commission correctly decided was worth defining for the reader, instead of leaving it to Merriam-Webster to decide whether a defendant should receive a four-level upward adjustment. Based on the definition provided by the Commission in the Commentary, Mr. Shirley did not engage in trafficking of firearms under USSG § 2K2.1(b)(5). Application Note 13 explains that two elements must be met for this Special Offense Characteristic to apply. The first element is met if a defendant "transferred, or otherwise disposed of two or more firearms to another individual." USSG § 2K2.1 cmt. 13(A). The second element is met if a defendant "knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual" (1) "whose possession or receipt of the firearm would be unlawful," or (2) "who intended to use or dispose of the firearm unlawfully." *Id*.

Mr. Shirley does not dispute the first element. Therefore, the central question is whether Mr. Shirley knew or had reason to believe that he was selling to a person "whose possession or receipt of the firearm would be unlawful" or to a person "who intended to use or dispose of the firearm unlawfully." The Commentary provides a very specific definition for the first phrase:

8

> "Individual whose possession or receipt of the firearm would be unlawful" means an individual who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.

USSG § 2K2.1 cmt. 13(B). Nothing about Mr. Shirley's sales indicates that he had reason to believe that the criminal informants posing as purchasers were previously convicted of crimes of violence, controlled substance offenses, or misdemeanor crimes of domestic violence, or were currently serving a sentence for any criminal offense.

As to the second phrase, there is no indication that Mr. Shirley believed he was selling firearms to a person "who intended to use or dispose of the firearm unlawfully." The government points to a few details about the circumstances of the sales and conversations with the buyers to support its theory that Mr. Shirley was purposefully selling firearms to people who intended to use or dispose of them in an illegal manner. First, the government claims that Mr. Shirley "sold them too many guns for two men to possess themselves." (Doc. 47 at 13). Of the items sold, there were 10 "guns" (seven rifles and three pistols) as well as five sound suppressors. *Id.* However, from the perspective of a passionate firearms enthusiast like Mr.

9

Shirley, there is nothing eyebrow-raising about one person owning five firearms.[1]

Second, the government claims that Mr. Shirley "had reason to believe that [the agent and informant] intended to use [the firearms] to commit violent crimes." (Doc. 47 at 14). In support of this, the government offers the fact that the agent told Mr. Shirley he wanted automatic firearms with sound suppressors. *Id.* However, plenty of people own automatic firearms and/or desire to reduce the acoustic intensity when their firearms are discharges, without intending to commit violent crimes. The government further points to the fact that Mr. Shirley did not ask his customers why they wanted sound suppressors or automatic firearms, whether they were convicted felons, or why they were doing business with him and not a licensed dealer. *Id.* However, rather than demonstrating that Mr. Shirley believed his customers intended to commit violent crimes, his failure to ask these questions – and receive answers – deprives the government of evidence to support their claim.

Third, the government points to Mr. Shirley's receipt of $14,800 cash from the agent and informant in exchange for the items as proof that he knew

---

[1] *See, e.g.*, Lois Beckett, *Meet America's Gun Super-Owners*, THE GUARDIAN, Sep. 20, 2016, https://www.theguardian.com/us-news/2016/sep/20/gun-ownership-america-firearms-super-owners ("In all, 22% of American adults are gun owners, according to a new survey of gun ownership . . . . In the new survey, conducted in 2015, about half of all gun owners . . . own a single gun, maybe two. Another third . . . own between three and seven guns. That top 14% of gun owners – a group of 7.7 [million] people, or 3% of American adults – own between about eight and 140 guns each. The average is 17.").

10

untraceable firearms paid for with cash are "perfect for gang warfare." However, there is simply no proof that this was the case. A criminal's preference to receive payment in cash in exchange for drugs, guns, or illegal services, and to not accept checks or credit cards, has everything to do with protecting their own self-interests (i.e., not creating a paper trail, avoiding dealing with the IRS, etc.). It is quite the leap to assume that Mr. Shirley did not take American Express because he wanted to assist with gang warfare. Furthermore, if anything, Mr. Shirley's receipt of payment and lack of interest in the details of his customers' intentions, demonstrates that he was selling firearms for financial gain, and not to perpetuate violent activities.

### III. The Special Offense Characteristic for use or possession of firearms "in connection with another felony offense" under USSG § 2K2.1(b)(6)(B) does not apply in this case.

The government argues for this four-level upward adjustment on two separate grounds. First, they argue for its application on the basis proposed in the Initial PSR: that Mr. Shirley "transferred firearms to individuals who he had reason to believe would illegally transfer them or use them to commit violent felonies." (Doc. 47 at 16). The basis of the government's argument here is essentially the same as it is for the "trafficking" enhancement. Therefore, Mr. Shirley would repeat the arguments made in the above section of this Memorandum in response to the government's argument.

11

Second, the government argues for application of this upward adjustment on the same basis they intended to argue from the early days of this case: that Mr. Shirley's simple possession of methamphetamine for personal use, which is a felony crime in the State of Florida, means that he "used or possessed any firearm or ammunition in connection with another felony offense," pursuant to USSG § 2K2.1(b)(6)(B). In support of this theory, the government attempts to link Mr. Shirley's habit of buying and using methamphetamine to his habit of possessing firearms. However, this argument relies on conflating the characteristics of drug possessors (who presumably must purchase drugs) with the characteristics of drug dealers (who sell and traffic in drugs). Simply put, this is a false analogy that, if widely applied, would lead to absurd results, and diminish the need to establish a firearm's "connection with" the other felony offense.

The Application Note explaining the applicability of this adjustment (to which three pages of text are dedicated), shows that more is required to show a "connection" when the felony is mere possession of drugs (as opposed to drug trafficking). *See* USSG § 2K2.1 cmt. 14. It states that the adjustment applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." USSG § 2K2.1 cmt. 14(A). It then provides a specific example for when the "other offense" is a drug offense. The note reads that section 2K2.1(b)(6)(B) applies "in the case of a drug *trafficking*

12

offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." USSG § 2K2.1 cmt. 14(B)(ii) (emphasis added). It reasons that in drug trafficking case, "application of [the adjustment] is warranted because the presence of the firearm has the potential of facilitating another felony offense." *Id.*

The Application Note does not provide an example of what happens when the other felony is drug possession for personal use. As the First Circuit noted, his leaves "open the question of whether having a firearm in connection with a simple drug possession offense is sufficient," on its own, to trigger the four-level enhancement. *United States v. Paneto*, 661 F.3d 709, 716 (1st Cir. 2011). However, it is telling that the Commission found it appropriate to only use drug trafficking, not drug possession, in their example of a situation in which the adjustment applies. As it turns out, courts have generally held that Note 14(B) is not applicable where "the defendant possessed a small quantity of drugs and there was no evidence of involvement in drug trafficking." *United States v. Tirado-Nieves*, 982 F.3d 1, 8 (1st Cir. 2020). *See also id.* at 7-9 (listing cases from multiple circuits that made similar findings).

The government cites to *United States v. Bishop*, 940 F.3d 1242 (11th Cir. 2019), in support of its argument. (Doc. 47 at 16-18). However, in that case the Eleventh Circuit *reversed* the decision of the district court applying the adjustment under USSG § 2K2.1(b)(6)(B). It held that the adjustment

13

was not proper when Mr. Bishop feloniously possessed a hydromorphone pill in proximity to a firearm when there was no showing that the firearm facilitated or had the potential of facilitating the drug possession. *Bishop*, 940 F.3d at 1252. The court in *Bishop* referred to similar cases in other circuits for guidance on the issue. It wrote:

> Several of our sister circuits have addressed this issue and concluded that the Application Notes clearly indicate that spatial proximity between a firearm and drugs is enough to show a "connection" when the underlying offense is drug trafficking, but something more must be shown for other felonies. *See United States v. Shields*, 664 F.3d 1040, 1045 (6th Cir. 2011) ("[P]roximity that is merely coincidental is not enough for application of § 2K2.1(b)(6) when a defendant merely possessed drugs. . . . To allow otherwise would render the distinction in the Guidelines commentary between drug trafficking and other felonies meaningless."); . . . *United States v. Jeffries*, 587 F.3d 690, 693 (5th Cir. 2009) ("If [Application Note 14(B)] had intended to allow a 'mere proximity' argument to suffice for all drug crimes, it would have said so. It did not."); . . . *United States v. Fuentes Torres*, 529 F.3d 825, 827 (8th Cir. 2008) ("[T]he Commission treated drug trafficking offenses and drug possession offenses differently.").

*Id.* at 1251 (some internal citation omitted).

Mr. Shirley was honest during his Presentence Interview and disclosed that he used methamphetamine every day for about 10 months until his arrest in February 2023. When law enforcement searched his home on the day of his arrest, they found a small baggie containing approximately 0.5 grams of methamphetamine. Nothing about the circumstances shows that he was engaged in drug trafficking. The only state crime he could potentially be

14

charged with here is felony possession of a controlled substance. To the extent that there was any spatial proximity between the drugs and the firearms, it should be expected considering that this was Mr. Shirley's home and nearly every part of it contained items related to his manufacture of firearms. Regardless, mere proximity is not enough to show that his firearms had the potential of facilitating his possession of drugs. Therefore, the upward adjustment under USSG § 2K2.1(b)(6)(B) does not apply to Mr. Shirley's case.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
Federal Defender, MDFL

_____
Scott T. Schmidt, Esq.
Assistant Federal Defender
Florida Bar No. 92534
200 West Forsyth Street, Suite 1240
Jacksonville, FL 32202
Telephone: (904) 232-3039
Fax: (904) 232-1937
Email: scott_schmidt@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of December, 2023, a true copy of the foregoing was served by electronic notification to Assistant United States Attorney Michael Coolican, Esq., and to United States Probation Officer Joshua Blakely.

*/s/ Scott Schmidt*
Scott T. Schmidt, Esq.
Assistant Federal Defender